UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                               :

In re Application Of UBS AG For An Order  :
Pursuant To 28 U.S.C. § 1782 To Conduct   :      Case No. 13 Misc. 0199-P1
Discovery For Use In Foreign Proceedings   :
                                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**UBS AG'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL
AND OPPOSITION TO JPMORGAN CHASE BANK, N.A.'S CROSS-MOTION FOR A
PROTECTIVE ORDER OR TO QUASH SUBPOENAS, AND FOR FEES AND COSTS**

David Spears
Mónica P. Folch
SPEARS & IMES LLP
51 Madison Avenue
New York, New York 10010
Tel: (212) 213-6996
Fax: (212) 213-0849
dspears@spearsimes.com
mfolch@spearsimes.com

*Attorneys for UBS AG*

Dated: May 7, 2014
       New York, New York

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ...................................................................................................................1

ARGUMENT ............................................................................................................................3

    I.    THE APPROPRIATE STANDARD FOR UBS'S MOTION IS THE LANGUAGE OF THE ORDER ...............................................................................3

    II.    UBS'S DISCOVERY REQUESTS ARE APPROPRIATE UNDER 17 U.S.C. § 1782 ............................................................................................................4

    III.    EACH OF UBS'S DISCOVERY REQUESTS IS APPROPRIATE UNDER THE FEDERAL RULES OF CIVIL PROCEDURE .......................................................6

        A.    Request One: Testimony From A 30(b)(6) Witness Explaining Why JPMC Did Not Transfer The $65 Million On October 14 Or Thereafter ................6

        B.    Request Two: Language Redacted From Four Post-October 14, 2008 Emails In Which Kaupthing's SWIFT Message And/Or The $65 Million Transfer Were The Exclusive Focus Of The Discussion ............................10

        C.    Request Three: Relevant Documents From Groups Involved In The Decision Whether To Transfer The $65 Million .......................................12

    IV.    JPMC'S CROSS-MOTION SHOULD BE DENIED ............................................12

CONCLUSION .......................................................................................................................14

# TABLE OF AUTHORITIES

## Cases

*In re App. Of OOO Premnefstroy*,
    No. M 19-99, 2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009) ......................................................6

*In re Edelman*,
    295 F.3d 171 (2d Cir. 2002).....................................................................................................4

*Ishihara v. Goldman Sachs Group, Inc.*
    No. 13 Misc. 280 (S.D.N.Y. Sept. 3, 2013) ..............................................................................6

## Statutes

17 U.S.C. § 1782................................................................................................................ *passim*

## INTRODUCTION

The information UBS seeks in this motion to compel goes to an important claim in the Icelandic Proceeding: Kaupthing improperly caused JPMC not to transfer the $65 million from Kaupthing to KSF by sending to JPMC a SWIFT message on October 9, 2008 instructing JPMC to hold all payments out of its account "by order of the Icelandic Financial Services Authority," when in fact there was no such order. UBS seeks information from JPMC to establish that Kaupthing's misrepresentation in its SWIFT message caused JPMC not to make the $65 million transfer.

In this proceeding, JPMC has testified that it did not make the $65 million transfer on October 9, 2008 because Kaupthing's account lacked sufficient funds and because it placed a hold on the account as a result of Kaupthing's SWIFT message. (ECF No. 26, Ex. 7 at 215-16.) But other evidence provided by JPMC makes clear that Kaupthing's account did have sufficient funds five days later on October 14, and for an extended period thereafter. (ECF No. 26, Ex. 5.) The follow-up question that UBS asks is: Why was the transfer not made on October 14 or after? UBS asked that very question at JPMC's Rule 30(b)(6) deposition, but JPMC had not prepared its witness to answer.

This lapse on the part of JPMC is indefensible. In the Stipulation so ordered by the Court on September 12, 2013 (the "Order"), JPMC *explicitly agreed* to provide testimony explaining "the reasons why" the $65 million was not transferred on October 9, 2008, *or on any of the following days up until November 30, 2008*. (ECF No. 26 Ex. 3 at ¶ 4(b).) Further, JPMC "represent[ed] in good faith" in the Order its belief that its witness's prospective testimony would satisfy its commitment. (*Id.* at ¶ 4(d).) But JPMC did not deliver on its promise. Instead, JPMC has sought at every turn to evade its express obligation to produce this critical information.

JPMC opposes the motion to compel on the grounds that the discovery requested is irrelevant, cumulative, and burdensome. But the relevance could not be clearer; JPMC can point to nothing in the discovery provided to date that includes the information sought; and the burden to JPMC from producing the information sought is, with regard to one of UBS's requests, non-existent.[1] In its memorandum in opposition JPMC finally discloses the true motivation for its unreasonable refusal to produce the limited information UBS has requested: JPMC believes that UBS seeks this information in order to sue JPMC. (JPMorgan Chase Bank, N.A.'s Memorandum of Law in Opposition to UBS AG's Motion to Compel and in Support of JPMC's Cross-Motion for a Protective Order or to Quash Subpoenas, and for Fees and Costs ("Opp.") at 16, 20.) But JPMC's paranoia cannot substitute for a substantive, meritorious argument in opposition. UBS has clearly articulated the logical and valid reason why it needs the requested information in the Icelandic Proceeding, and JPMC has failed to counter with any persuasive argument.[2] Moreover, as conceded by JPMC, over the course of numerous letters and telephone calls, UBS has dramatically reduced the scope of its outstanding requests. (*See* Opp. at 6; *see*

---

[1] UBS regards the three categories of information it has requested to be separate approaches to obtaining a definitive answer as to whether the language of Kaupthing's October 9, 2008 SWIFT caused JPMC not to make the $65 million transfer on or after October 14. Accordingly, any one of the three categories of information sought by UBS could – conceivably – serve UBS's discovery purpose in full. In particular, disclosure of the redacted language from the four emails identified by UBS is likely the most straightforward and efficient approach to providing the information UBS seeks, and there would be no burden to JPMC from disclosing this information. *See* the discussion of the redactions at pages 10-11 below.

[2] In a footnote, JPMC cites UBS's December 20, 2013 letter seeking "production of the [requested] emails immediately" and explaining that disclosure deadlines in the Foreign Proceedings had already passed (Opp. Addendum 1) in support of its "belief that UBS is simply on a fishing expedition for a claim against JPMC" (Opp. at 16 n. 11). But in that letter UBS made clear that while JPMC's delay undeniably prejudiced UBS insofar as "many submissions have been made to the [foreign] courts without the benefit of the information sought," UBS was still able to make further document productions in both proceedings. (Opp. Addendum 1 (As to English Proceeding, "[t]he deadline for disclosure of documents has long passed, and, under the rules of that Court, any further document production must take place without delay." As to the Icelandic Proceeding, "deadline for initial disclosures has also expired," but "the parties are preparing for a court hearing in mid-January, the express purpose of which is the disclosure of relevant documents.").) In the Icelandic Proceeding, UBS's next opportunity to submit further relevant documents to the Icelandic Court is May 26, 2014, and there is no assurance that there will be a subsequent opportunity.

*also* Memorandum in Support of UBS AG's Motion to Compel Discovery from JPMorgan Chase Bank, N.A. ("Mem.") at 7-8.)  UBS has acted in good faith and made every effort to narrow the information sought to the bare minimum needed to pursue its claim in Iceland.

Respectfully, this Court should require JPMC to provide the information sought by UBS's motion to compel.

## ARGUMENT

### I. THE APPROPRIATE STANDARD FOR UBS's MOTION IS THE LANGUAGE OF THE ORDER

JPMC challenges UBS's requests under legal principles it purports to find in 17 U.S.C. § 1782 and the Federal Rules of Civil Procedure, and it faults UBS for "omit[ting] all discussion of any relevant legal standard in its brief." (Opp. at 7.)  But UBS's requests are made pursuant to the clearly controlling terms of the Order, and the Order is the relevant standard.[3]

Moreover, it is absurd to say that "[b]ecause UBS brought its application for discovery under Section 1782 *ex parte*, JPMC has not yet had the opportunity to challenge the Court's initial order under that statute." (Opp. at 8.)  UBS served the Document Subpoena on JPMC on June 12, 2013, the same day Judge Preska issued the order pursuant to Section 1782 authorizing UBS to take discovery from JPMC.  (ECF No. 4.)  So JPMC's opportunity to challenge Judge Preska's order existed as of June 12, 2013, at which point JPMC was free to move to quash that subpoena.  Similarly JPMC could have moved at a later time to quash the 30(b)(6) Subpoena when it was served.  But JPMC never moved to limit or challenge either subpoena in any way.

---

[3] In a footnote, JPMC attempts to distance itself from its obligations under the Order, claiming that it "preserved its right to challenge the propriety of any requested discovery under Section 1782 and the Federal Rules." (Opp. at 8 n.7.)  But JPMC did not preserve its right to refuse to fulfill its obligations under the terms of the Order; otherwise, those obligations would have been rendered meaningless from the outset.

3

In any event, UBS is entitled to discovery from JPMC under Section 1782 and the Federal Rules of Civil Procedure, as JPMC very properly concluded when it asked the Court to issue the Order.

## II. UBS'S DISCOVERY REQUESTS ARE APPROPRIATE UNDER 17 U.S.C. § 1782

Section 1782 authorizes United States District Courts to order discovery from third parties in the U.S. for use in foreign proceedings. UBS's application for discovery from JPMC for use in the Icelandic Proceeding meets the statutory requirements for a Section 1782 application: JPMC is a national banking association with its principal place of business in New York City; as the bank that held the Kaupthing account at issue, JPMC has information sought by UBS for use in the Icelandic Proceeding; and UBS is a party to the Icelandic Proceeding. *See In re Edelman*, 295 F.3d 171, 175-76 (2d Cir. 2002). Yet JPMC challenges UBS's Section 1782 application, arguing that UBS should have sought the requested discovery in the Foreign Proceedings because some of the JPMC representatives involved in its investigation of the Mistaken Payment are located in England. (Opp. at 9, n.8, 14.) JPMC's challenge fails for a host of reasons.

First, the discovery that UBS seeks is for use in the Icelandic Proceeding, and JPMC nowhere suggests that the Icelandic Court has the authority to compel production from JPMC, a U.S. entity. Second, to the extent that JPMC is suggesting that UBS should have sought the requested information from JPMC in the English Proceeding for use in the Icelandic Proceeding – a suggestion that borders on the absurd – there can be no doubt that any English affiliate of JPMC that received such a request from UBS in the English Proceeding would argue that the request should be made to JPMC in the U.S. because it seeks JPMC's materials.

4

In any event, UBS's Section 1782 application is entirely appropriate: The application seeks information from JPMC, the U.S. bank that was directly involved in the attempted transfer of the Mistaken Payment, and the information sought relates to JPMC's role in the attempted transfer of the Mistaken Payment. The JPMC account at issue is a U.S. dollar account held in the U.S., and the account statements *all* bear a U.S. address for JPMC. (*See, e.g.*, ECF No. 26, Ex. 5.) *All* JPMC SWIFT messages to UBS or Kaupthing concerning the Mistaken Payment – including those initiated by JPMC representatives located abroad – were sent from JPMC's U.S. SWIFT address (CHASUS33) and bear JPMC's physical address in New York City. (*See* Declaration of David Spears in Further Support of UBS AG's Motion to Compel and in Support of Its Opposition to JPMorgan Chase Bank, N.A.'s Cross-Motion for a Protective Order or to Quash Subpoenas ("Spears Decl.") Ex. A; Spears Decl. Exs. C, E, F, H, I.) *All* Kaupthing SWIFT messages to JPMC regarding the Mistaken Payment, including the October 8 SWIFT authorizing the $65 million transfer to KSF and the October 9 SWIFT instructing JPMC to hold all payments pursuant to a non-existent FSA order, were sent to JPMC's U.S. SWIFT address. (Spears Decl. Ex. D, G, J.) And UBS's October 8, 2008 SWIFT message to JPMC instructing JPMC to transfer the $65 million from Kaupthing's account to KSF's account was sent to JPMC's U.S. SWIFT address. (Spears Decl. Ex. B.) Moreover, *all* of the JPMC representatives located abroad who appear to have been involved in the investigation of the Mistaken Payment have an "@JPMCHASE" email address, as reflected in the documents produced by JPMC. (*See* ECF No. 26 Exs. 8-12.) That JPMC used representatives abroad as either employees or agents to investigate the Mistaken Payment does not change the fact that JPMC, a U.S. bank, was the entity that held the Kaupthing and KSF accounts at issue, received the $65 million Mistaken

5

Payment from UBS, and was responsible for completing the transfer of the $65 million from Kaupthing to KSF.

In sum, JPMC's documents and testimony are unquestionably the appropriate focus of UBS's efforts to obtain information about the Mistaken Payment, and Section 1782 has been properly invoked in aid of that effort.[4]

### III.  EACH OF UBS'S DISCOVERY REQUESTS IS APPROPRIATE UNDER THE FEDERAL RULES OF CIVIL PROCEDURE

#### A.  Request One: Testimony From A 30(b)(6) Witness Explaining Why JPMC Did Not Transfer The $65 Million On October 14 Or Thereafter

JPMC argues that UBS's request for additional testimony explaining why JPMC did not transfer the $65 million on October 14 or after is "improper" because (1) UBS failed to request this testimony during the Deposition, and (2) such testimony is cumulative of testimony already provided.  (Opp. at 13-15.)  JPMC's arguments are factually incorrect.

This is the relevant testimony:

> UBS Counsel:  So, based upon our lengthy and thorough review of this document, [the Investigative Report], can you tell me the reason why the direction to transfer 65 million from Kaupthing to KSF was not done – honored by JPMC on October 9?
>
> JPMC Counsel:  Object to the form.  You can answer.
>
> …
>
> Mr. Ramirez:  Well, in preparation – I mean, the status 45 either means insufficient funds or hold.  In preparation for today, I wanted to find out which of the two it meant, so I reached out to the customer service officer,

---

[4] The cases cited by JPMC are not to the contrary, as they involve Section 1782 requests for information that had little or no connection to the U.S.  See *Ishihara v. Goldman Sachs Group, Inc.*, No. 13 Misc. 280, ECF No. 19 at 10 (S.D.N.Y. Sept. 3, 2013) (denying Section 1782 application where applicant was "seeking to get from [a U.S. entity] and affiliate companies documents that are, in the first instance, documents of the [Japanese] subsidiary he has sued in Japan" and "very largely concern his interactions with [the Japanese subsidiary], and include records of internal communications and other documents inherent to [the Japanese subsidiary]"); *In re App. Of OOO Premnefstroy*, No. M 19-99, 2009 WL 3335608, at *6-*9 (S.D.N.Y. Oct. 15, 2009) (denying Section 1782 application where the information sought was "principally foreign in nature" insofar as it related to the actions of Dutch, Russian, and British Virgin Island companies, many of which were parties in the Dutch litigation).

6

[Leearn Ellis], and she advised me that on October 8th and on October 9th the account was insufficient, and she further advised me that on the 9th a SWIFT message was received from Kaupthing Bank indicating to put their account on hold.  So, in this case, it's – it was both, insufficient funds and a hold was put on the account.

…

UBS Counsel:  Would you agree with me that [$70,502,347.85 on October 14, 2008] is sufficient funds to pay $65 million?

JPMC Counsel:  Object to the form.

Mr. Ramirez:  It's enough to cover it, yeah.

UBS Counsel:  Okay.  And did you discuss with Ms. Ellis why, when there came a time when there were sufficient funds, the money wasn't paid?

JPMC Counsel:  Object to the form.

Mr. Ramirez:  No.

JPMC Counsel:  That would be outside the scope of the deposition.  But I object.  Your can answer.

Mr. Ramirez:  No.  I only had the one question.

UBS Counsel:  Can you tell me again what your exact question was?

Mr. Ramirez:  Was the status 45 due to the fact there was insufficient funds or a hold was placed, and she advised that it was insufficient on the 8th and the 9th, and then on the 9th a SWIFT message came in and advising JPMorgan to put the account on hold.

UBS Counsel:  Okay. And did you – I take it you did not ask her, did "status 45" mean insufficient funds at one time and account on hold at another time, so they weren't both applicable for every day between October 9th and November 30?

JPMC Counsel:  Object to the form, beyond the scope.  You can answer.

Mr. Ramirez:  No, I didn't ask that question, just –

JPMC Counsel:  Answer the question that's asked.

7

   Mr. Ramirez:  No.

(ECF No. 26 Ex. 7 at 215-216, 219-220.)

  First, UBS did ask Mr. Ramirez to explain why JPMC did not make the transfer on October 14 or after.  JPMC argues that UBS never asked Mr. Ramirez "whether the 'status 45' entry listed in the Investigative Report on October 15, 2008 meant insufficient funds or a hold," stating that UBS "instead" asked Mr. Ramirez whether he "discuss[ed] with Ms. Ellis why, when there came a time when there were sufficient funds, the money wasn't paid."[5]  (Opp. at 13.)  But a few lines down in the transcript, counsel for UBS posed the more "precise" question that JPMC says was never asked:  "And did you – I take it you did not ask her, did 'status 45' mean insufficient funds at one time and account on hold at another time, so they weren't both applicable for every day between October 9th and November 30?"  (ECF No. 26, Ex. 7 at 220.)  Mr. Ramirez answered, "No."  (*Id.*)

  Second, at no time did Mr. Ramirez provide the reason why JPMC did not transfer the $65 million on October 14 or after.  JPMC argues that Mr. Ramirez's testimony regarding the meaning of "status 45" on October 9 "answers the question" why the $65 million was not transferred on October 14 or after, when there were sufficient funds.  (Opp. at 10.)  The argument appears to be that, because Mr. Ramirez testified that "status 45" "in general" means that there are insufficient funds in the account or that a hold was placed on the account (ECF No. 26, Ex. 7 at 166), "status 45" must have meant that there was a hold on the account on October 14, since there were sufficient funds in Kaupthing's account on that date.  That argument should be rejected.

---

[5] In its memorandum in opposition, JPMC claims that Mr. Ramirez responded to this question by saying, "'No' and that he did not feel the need to do so."  His actual response was, "No.  I only had the one question."

JPMC is asking UBS to draw an inference from the testimony provided regarding the "general" meaning of "status 45." But JPMC is required to provide "the reason" for the non-transfer on October 14 (and after), not just sufficient "general" information from which UBS could probably figure out the reason. Under the Order, JPMC must provide a specific explanation of what "status 45" meant on October 14 and after, when that code was invoked to block the transfer from Kaupthing to KSF.[6] (ECF No. 26 Ex. 3 at ¶ 4(b).) JPMC's proposed inference is simply not an adequate answer and does little to narrow the range of possible reasons for the non-transfer on October 14 and after. After all, the emails produced by JPMC make clear that its decision not to transfer the $65 million when there were sufficient funds was the result of deliberation and consultation among a host of JPMC representatives assembled by email to review and discuss Kaupthing's misleading October 9 SWIFT to JPMC and respond to Bryony Cullen's "urgent[]" request of October 15 for advice on how to "clear" the transfer.[7] (ECF No. 26, Exs. 8-12.).

---

[6] Despite the fact that the Order explicitly requires JPMC to produce a witness who would be "knowledgeable about and prepared to testify about only coding or technical or other language" in the Investigative Report, "including without limitation the reason or reasons why the $65 million … was not transferred to KSF on October 9, 2008 or on any of the following days up until November 30, 2008," (ECF No. 26 Ex. 3 at ¶4(b)) and despite the fact that in the Order, JPMC "represent[ed] in good faith" its belief that such testimony would "explain the reasons why the $65 million . . . was not transferred to KSF on October 9, 2008, or on any of the following days up until November 30, 2008," (Id. at ¶ 4(d)) when counsel for UBS inquired what "status 45" meant on October 14 or after, counsel for JPMC objected to two different formulations of that question on the ground that the information sought was "outside the scope of the deposition." (ECF No. 26 Ex. 7 at 219-20.) In light of counsel's objection to the questions *and* Mr. Ramirez's lack of preparation on the issue, it appears that JPMC made a deliberate decision not to provide that information at the deposition.

[7] JPMC claims to have had "a mechanical role as the accounts' administrator" (Opp. at 5) and to have "simply held the account of Kaupthing and acted at its discretion" (Opp. at 7, n.6). But the Account Terms for the accounts at issue suggest otherwise. Under the Account Terms, a "Customer may reverse, amend, cancel or revoke any Instructions only with the consent of the Bank and the beneficiary's bank. (Spears Decl. Ex. K (emphasis added).) In this case, JPMC was both "the Bank" and "the beneficiary's bank," since it held both Kaupthing's and KSF's accounts. Because Kaupthing had authorized the $65 million transfer to KSF on October 8, 2008, under the Account Terms, JPMC appears to have been required to exercise its discretion to "consent" to cancelling the transfer. (*See Id.*)

During the Ramirez deposition, Kaupthing pointed out the inadequacy of the answer JPMC now seeks to defend.  Kaupthing asked Mr. Ramirez:  "[Y]ou stated that 'status 45' may be used to indicate that there's insufficient funds in the accounts or that the account is on hold.  In the case [where] it is referencing an account that is on hold, does the 'status 45' indicate the origination of that hold?"  (ECF No. 26 Ex. 7 at 225.)  Mr. Ramirez answered:  "In [the Investigative Report], no."  (*Id.*)  The "origination of that hold," as it existed on October 14, 2008 and after, is precisely the information UBS seeks to discover from JPMC for use in the Icelandic Proceeding.

JPMC's next argument is that "requir[ing] a 30(b)(6) witness unfamiliar with the accounts to testify in the U.S. where, as here, the knowledgeable employees are located abroad" is inefficient.  (Opp. at 14.)  Again, JPMC has already agreed to provide the testimony in the U.S., so efficiency arguments have no place here.  Moreover, the approach UBS has employed under Section 1782 is not only the most efficient approach, it is the only possible one for obtaining discovery from U.S.-based JPMC.  And JPMC has already demonstrated the ease with which it can "prepare" Mr. Ramirez by obtaining essential information with a single telephone call.

> B. Request Two: Language Redacted From Four Post-October 14, 2008 Emails In Which Kaupthing's SWIFT Message And/Or The $65 Million <u>Transfer Were The Exclusive Focus Of The Discussion</u>

Despite previously labelling all of the challenged redactions as "irrelevant," JPMC now admits that at least some of the redactions are relevant insofar as they "discuss the $65 million at issue."  (Opp. at 15.)  Even so, JPMC seeks to prevent disclosure of the redacted language on the ground that the redactions are not relevant in the Icelandic Proceeding because the issue there is "whether ***Kaupthing's*** instruction to JPMC to put the payments out of its account was proper."

(Opp. at 15-16 (emphasis (italics and bold) in original).)  Thus JPMC appears to argue that its reason for not transferring the $65 million is not relevant in the Icelandic Proceeding because the focus should only be on Kaupthing's wrongdoing in issuing its misleading instruction to JPMC. But UBS has already explained the very basic tort principles at issue in the Icelandic Proceeding: The misleading instruction from Kaupthing must have *caused* JPMC's failure to transfer the money.[8]  (Mem. at 8.)  Therefore the reason for JPMC's decision not to transfer the money is obviously relevant to the Icelandic Proceeding.

Leaving aside JPMC's strained arguments regarding relevance, disclosure of the redacted language UBS seeks is the most straightforward and efficient way to a resolution of this discovery dispute.  It simply defies logic to argue that the redacted language does not bear on JPMC's reason for not transferring the $65 million.  As discussed at length in UBS's opening brief, the emails appear to be about precisely that.  Further, there would be no conceivable burden to JPMC from disclosing the redacted language.  Indeed, the Court could direct JPMC to provide the emails in unredacted form for *in camera* review, following which the Court could rule.

UBS acknowledges that while the redacted language could provide evidence it needs to support its claim in Iceland, that language may well undermine its claim.  But from the outset of this proceeding UBS's purpose in seeking discovery has been to learn what happened to the Mistaken Payment, and UBS understands that what it receives in discovery could be unfavorable rather than favorable.

---

[8] JPMC argues that UBS has failed to establish relevance because it has not submitted any filings from the Icelandic proceeding.  (Opp. at 16.)  UBS has already discussed the relevance of the requested information in great detail.  (*See* Mem. at 16; ECF No. 26 at ¶¶ 19-27.)  Nevertheless, in response to JPMC's complaint that UBS has not met its burden in that regard, UBS is attaching the relevant UBS brief as filed in Icelandic, along with an office translation by UBS's Icelandic counsel of the relevant sections.  (Spears Decl. Ex. L.)

### C.   Request Three:  Relevant Documents From JPMC Groups Involved In The Decision Whether To Transfer The $65 million

JPMC argues that because "JPMC has already provided relevant electronic communications for [five] custodians . . . any additional emails located through additional searches would be either irrelevant or entirely cumulative (if not exactly duplicative) of the correspondence already produced."  (Opp. at 20.)  In other words, because JPMC already produced *some* emails for *some* custodians in certain groups, it should not have to search for relevant emails for *any* other custodians in the same groups.  This argument is illogical.  How could JPMC possibly know that all documents would be cumulative or duplicative without conducting the searches?  More likely, relevant information from documents obtained through one search will lead to productive searches for additional relevant documents.  And the fact that some documents may be outside the U.S. does not alter that fact that the groups were acting on JPMC's behalf when they investigated the Mistaken Payment and decided not to make the transfer.

### IV.   JPMC'S CROSS-MOTION SHOULD BE DENIED

JPMC's Cross-Motion is based on the demonstrably false assertion that UBS has requested discovery that is "either irrelevant or cumulative of prior disclosures."  (Opp. at 20.) To the contrary, the information requested is not only relevant, but also critical to the Icelandic Proceeding, and JPMC has thus far refused to produce it.  On these facts, neither a protective order nor an award of fees is remotely warranted.

JPMC seems to be arguing that any discovery sought beyond the testimony given at the deposition and the emails produced pursuant to Paragraph 6 of the Order is improper.  Indeed, JPMC accuses UBS of ratcheting up its discovery requests at every opportunity, even in the face of what it characterizes as "JPMC's good faith efforts to reach a quick and reasonable

12

resolution." (Opp. at 20.) Both of those characterizations are woefully misguided. First, UBS has steadily ratcheted down its discovery requests at every opportunity, finally reducing them to the three presently before the Court, which can be viewed in the alternative. (*See* Mem. at 7-8.) Second, "JPMC's good faith efforts to reach a quick and reasonable resolution" have consisted exclusively of a demand that UBS agree to accept absolutely nothing from JPMC in response to any and all of UBS's requests, including UBS's present requests.[9] JPMC's unwavering proposal for a "resolution" that provides UBS with nothing, which JPMC confirms in its opposition, would indeed be "quick," but it definitely would not be "reasonable."

---

[9] JPMC states that before UBS filed the instant motion to compel, JPMC "attempted to negotiate a resolution to the dispute, but UBS elected to instead pursue the pending motion." (Opp. at 6, n.5) But JPMC's "attempted" "resolution" consisted of an offer to provide a written supplement to the 30(b)(6) deposition conveying that on October 9, 2008, JPMC received a SWIFT message from Kaupthing requesting that all payments be placed on hold, and that as a result of that SWIFT, a hold was placed on the account. That statement *is* cumulative of the discovery JPMC has already produced. And, as discussed at length in UBS's opening brief and in this Reply, it does not provide the information UBS requires (which JPMC agreed to provide): the reason the $65 million was not transferred on October 14 or after.

13

## **CONCLUSION**

For the foregoing reasons, UBS respectfully requests that the Court order JPMC to provide the testimony and produce the information and documents sought by its motion to compel.

Dated: New York, New York
May 7, 2014

                                      Respectfully Submitted,

                                      SPEARS & IMES LLP

                                      /s/ David Spears
                                      David Spears
                                      Mónica P. Folch
                                      51 Madison Avenue
                                      New York, New York  10010
                                      Tel:  (212) 213-6996
                                      Fax: (212) 213-0849
                                      dspears@spearsimes.com
                                      mfolch@spearsimes.com

                                      *Attorneys for UBS AG*